IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAFTWORK, INC., a Florida corporation, ) <br> and JOSEPH R. MINNIX, ) <br>  ) <br> Plaintiffs, ) <br>  ) <br> v. ) <br>  ) <br> THEODORE ROBINSON, JEFFREY W. DEER, ) <br> DEER, STONE & MAYA, P.C., CURTIS L. ) <br> EISENBERG, and WIMBLEDON LAKE ) <br> BLUFF LLC., ) <br> Defendants. ) | CASE NO.: 10-cv-3629 <br><br> Judge Robert M. Dow, Jr. |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court a motion to dismiss [49] filed by Defendants Jeffrey Deer and Deer, Stone & Maya, P.C. ("DS&M") (collectively the "Deer Defendants"). The Deer Defendants move to dismiss Counts III, V, VI, VII, VIII, and IX of Plaintiffs' amended complaint. For the following reasons, the Court denies the Deer Defendants' motion to dismiss [DE 49] in its entirety.

**I.   Factual Background[1]**

In November and December 2008, Plaintiffs Joseph Minnix and Craftwork, Inc. ("Plaintiffs") invested $601,500 pursuant to two separate schemes. The first scheme, allegedly spear-headed by Defendant Theodore Robinson, involved a $341,500 investment by Plaintiffs. The money was transferred by Plaintiffs to the client trust fund account at DS&M, with Attorney Jeffery Deer allegedly acting as escrow agent for Plaintiffs. The second scheme involved a

---

[1] For purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See, *e.g., Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

$260,000 loan from Plaintiffs to Defendant Curtis Eisenberg. The money again was transferred to the client trust fund account at DS&M, with Deer acting as escrow agent for Plaintiffs.

According to Plaintiffs' amended complaint, with respect to the first scheme, Robinson marketed to Minnix a "confidential, proprietary securities trading program," and Plaintiffs bit. Plaintiffs were to deposit significant sums of money with Robinson and his "business partners," who would then make "trades" via affiliates on the West Coast and in Europe and Australia. According to Plaintiffs, Robinson told them how he would take his clients' cash and "leverag[e] it up to ten times to permit significant trading volume to occur, thereby generating cash to repay the principal invested and to pay a significant return (50% to 100%) within four (4) months—all with no risk to the principal invested." Amended Complaint at ¶ 16. On November 21, 2008, Plaintiffs wired a $15,000 "investment" to DS&M's client funds account at Bank Financial in Deerfield, Illinois. On December 24, 2008, Plaintiffs wired $300,000 to the client funds account. On January 8, 2009, Plaintiffs wired another $26,500 directly to Robinson's bank.

According to the amended complaint, Deer instructed Plaintiffs to contact him if they had any questions concerning their "investment." Beginning in early 2009 and continuing over the next several months, Minnix began asking Deer if he knew when the "trading" would start and when he would begin to see profits on the investment. Each time that Plaintiffs inquired with Deer as to the status of the "trading," Plaintiffs allege that there was "some explanation" for why the trading had not yet started and why no distribution of money could be paid at that time. On June 29, 2009, Plaintiffs asked Deer what his "comfort level" was with respect to the "investment" and Deer replied that he had a "good comfort level." Plaintiffs allege that Deer affirmatively reassured Plaintiffs that he was drafting trading contracts while other members of

2

the scheme were traveling to Europe to start trading. None of the money that Plaintiffs allegedly invested has been repaid, nor did they make any return on their investment.

With respect to the second scheme, in late January 2009, Robinson and Deer contacted Minnex to discuss a real estate project. Deer allegedly asked Minnix to loan $260,000 for the Village of Lake Bluff to hold in escrow for a project called Wimbledon Estates of Lake Bluff. Minnex orally agreed on behalf of Craftwork to loan the money. Plaintiffs alleged that Deer "specifically informed Minnex that [Deer] would be acting as Craftwork's 'escow attorney' with respect to the loan." Deer then drafted and signed a letter dated January 29, 2009, purportedly on behalf of Curtis Eisenberg and Wimbledon Lake Bluff LLC, which memorialized the terms of the loan. The letter stated that Eisenberg and "the owners of Lake Bluff property" had retained Deer and his law firm, and that Craftwork agreed to loan Eisenberg and Wimbledon $260,000 for four months which a possible 30 day extension of this term. The letter also stated that Craftwork was to receive a fee of $50,000 and an option to perform any mill work that may be needed for improvements to the property. Deer sent the letter to Plaintiffs, and Minnex signed the letter on behalf of Craftwork. That same day, Plaintiffs wired $260,000 to DS&M's client funds account.

As of January 29, 2009, Plaintiffs believed that the Deer Defendants were acting on behalf of Eisenberg and Wimbledon. Plaintiffs also believed that the Deer Defendants were acting as their attorney, based on Deer's assurance that he was Craftwork's "escrow attorney" for purposes of the loan. Since filing the lawsuit, Plaintiffs have learned that Eisenberg and Wimbledon contend that the Deer Defendants were not authorized to act as their agent or enter into the loan agreement on their behalf. Although Plaintiffs requested documentation confirming that the $260,000 was given to the Village of Lake Bluff to hold in escrow, no such

3

documentation was ever provided. Instead, the money was placed in an account at Lake Forest Bank and Trust to support a letter of credit that the bank issued in favor of Wimbledon. Furthermore, Eisenberg and Wimbledon contend that they received only $200,000 of the $260,000 that Plaintiffs wired on January 29, 2009. Deer now contends that the remaining $60,000 was not given to Eisenberg and Wimbledon but was used for "costs associated with the loan placement." According to Plaintiffs, they never authorized Deer to pay himself a "placement fee." Plaintiffs have never been repaid for their loan.

## II.  Legal Standard for Rule 12(b)(6) Motions to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555, 569 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 562. The Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

4

Rule 9(b) of the Federal Rules of Civil Procedure creates exceptions to the federal regime of notice pleading and specifies that, for "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir. 2007). "Read together, Rule 9(b) and Rule 8 require that the complaint include the time, place and contents of the alleged fraud, but the complainant need not plead evidence." *Amakua Development LLC v. Warner*, 411 F. Supp. 2d 941, 947 (N.D. Ill. 2006) (citing *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, 1993 WL 360426, at *3 (N.D. Ill. Sept. 15, 1993)). In other words, the complaint must allege the "the who, what, when, where, and how: the first paragraph of a newspaper story." *Borsellino,* 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)). Any of Plaintiffs' claims sounding in fraud will be viewed under this heightened pleading standard.

## III.  Analysis

Plaintiffs have brought the following claims against the Deer Defendants: breach of contract (Count III), conversion (Count V), fraud (Count VI), professional negligence (Counts VII and VIII), and civil conspiracy between Deer and Robinson (Count IX). The Deer Defendants have filed a motion to dismiss all claims asserted against them, maintaining that there never was an attorney-client relationship between Plaintiffs and the Deer Defendants, and that the Deer Defendants acted consistently with any agreements alleged by Plaintiffs.

### A.  Breach of Contract (Count III)

Plaintiffs' breach of contract claim is pled as an alternative to Count II, which alleges that the Deer Defendants acted as authorized agents of Wimbledon when they negotiated the $260,000 loan between Plaintiffs and Eisenberg and Wimbledon. In Count III, Plaintiffs assert

that if the Deer Defendants were not the authorized agents of Wimbledon, then they are personally liable for the loan.[2]

"[T]he well established rule is that an agent making a contract which he had no authority to make binds himself personally according to the terms of the contract." *Chapman v. Diedrich*, 325 N.E.2d 66, 68 (Ill. App. Ct. 1975). In *Chapman*, an architect sued the attorney who had hired him to prepare plans for a project. The attorney maintained that he was the agent of his client, but the court held that it was "clear from the record that the defendant Diedrich had no authority from his client to enter into a contract with plaintiff and hence he is personally liable for payment of the architectural fees." *Id*. at 68. Here, Plaintiffs allege that Deer and DS&M were not authorized to enter into the contract on behalf of Wimbledon. Although Deer recites in the letter that he is authorized by Wimbledon, this does not mean that Deer was in fact authorized. Deer cannot create his own authority. Rather, whether or not the Deer Defendants were authorized is an issue that cannot be resolved at this time, without further development of the record.

In support of their position, the Deer Defendants maintain that if an attorney makes a contract on behalf of his client, the attorney is not personally liable on that contract. See, *e.g.*, *Thornberry v. Board of Educ.*, 290 N.E. 2d 360 (Ill. App. Ct. 1972). Defendants' recitation of the law is correct as far as it goes, but it applies only when the contract is made for the attorney's client. If the evidence shows that Wimbledon authorized the Deer Defendants to act on its behalf and the Deer Defendants did not agree to become personally liable on the contract, then the Deer Defendants will not be found to have breached the contract. See, *e.g.*, *Storm & Associates, Ltd. v. Cuculich*, 700 N.E.2d 202, 211 (Ill. App. Ct. 1st Dist. 1998) ("It has been long settled in

---

[2] In its answer, Defendant Wimbledon contends that the Deer Defendants were not authorized to enter into a loan agreement on Wimbledon's behalf.

6

Illinois that, when an agent entering into a contract with another discloses both his agency status and the name of his principal or when the party dealing with the agent knows that the agent is acting for his principal in making a contract, the agent is not liable on the contract unless he agrees to become personally liable."). But both Plaintiffs and Wimbledon have alleged that the Deer Defendants were *not* authorized to act on Wimbledon's behalf, and these allegations are sufficient to withstand a motion to dismiss.

The Deer Defendants also maintain that if they lacked authority to make the contract, and if Wimbledon ratified the contract, then Wimbledon is liable. Generally speaking, "[t]he power of a party to avoid a contract for mistake or misrepresentation is lost if after he knows or has reason to know of the mistake * * * he manifests to the other party his intention to affirm it." Restatement (Second) of Contracts § 3 80(2) (1981). A party acquiesces to a contract when it fails to repudiate benefits received, indicating acceptance of the contract terms. See *Carr v. Runyan,* 89 F.3d 327, 332 (7th Cir. 1996). However, it is disputed whether Wimbledon ratified the contract. Plaintiffs have alleged that the terms of the contract were: (i) a $260,000 loan from Craftwork to Wimbledon; (ii) the money to be deposited into an escrow account at the Village of Lake Bluff; and (iii) the loan to be repaid in four months with a $50,000 fee. Plaintiffs allege that only $200,000 was actually sent to Wimbledon and that Deer kept $60,000. Plaintiffs further allege that the loan was not repaid and that they did not receive their fee. Taking these allegations as true, there was, at best, a partial ratification. Furthermore, "[i]n order to bind a principal by ratification it must be shown that [the principal] had full knowledge of the facts." *Chapman*, 325 N.E.2d at 68. Accepting only $200,000 of the $260,000 would not necessarily be a ratification of the contract. Plaintiffs' allegations and the attachments to Plaintiffs' amended complaint do not conclusively demonstrate that Wimbledon ratified the alleged contract or

7

acquiesced to it. The evidence may show otherwise, but inquiring into the evidence at this time is inappropriate. The allegations control, and Plaintiffs' have stated a claim for breach of contract. See, *e.g.*, *U.S. v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005) (noting that "usually * * * complaints do not have to anticipate affirmative defenses to survive a motion to dismiss" except when "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations.").

### B. Conversion (Count V)

In Count V, Plaintiffs allege that the Deer Defendants converted for their own use $60,000 of the $260,000 that Craftwork wired to DS&M's client funds account. In order to recover for conversion in Illinois, a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (citing *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (1998)). The Deer Defendants maintain that Plaintiffs' claim for conversion must be pled under Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, but Defendants have failed to provide a single case in which Rule 9(b)'s heightened pleading standard was applied to a claim for conversion. The Court declines to do Defendants' work for them, and also notes that this appears to be a straightforward conversion claim subject to Federal Rule of Civil Procedure 8 (see, *e.g.*, *Tkachyov v. Levin*, 1999 WL 782070, at *4 (N.D. Ill. Sept. 27, 1999)), but even if it were subject to Rule 9(b), as set forth below, Plaintiffs' allegations state a claim conversion.

Plaintiffs allege that the contract at issue provided that (i) Plaintiffs would lend $260,000 to Wimbledon; (ii) the money would be put in escrow at the Village of Lake Bluff; and (iii) Plaintiffs would be repaid in four months and receive a fee of $50,000. The Deer Defendants contend that because the letter does not explicitly prohibit Deer from taking $60,000 for its own use—in other words, "[n]owhere in that agreement did defendants state that the entire loan would be applied directly to the municipal escrow fund"—they were allowed to do just that. See Deer Def. Memorandum in Support of Motion to Dismiss at 6. This argument fails the straight face test. See *Targin Sign Systems, Inc. v. Preferred Chiropractic Center, Ltd.*, 679 F. Supp. 2d 894, 899 (N.D. Ill. Jan. 21, 2010) (describing "lawyers' legal frivolousness" in terms of the "straight face test"). First, the letter refers to the "$260,000 loan," not the $200,000 loan with a $60,000 fee to Jeffrey Deer and DS&M. The reasonable (and likely only) inference is that Plaintiffs' believed Deer's clients were borrowing $260,000 for the Lake Bluff project—not that they were borrowing $200,000 and Deer was charging a fee of $60,000. Nothing in the letter authorized Deer to retain Plaintiffs' $60,000 for his own use.[3] Furthermore, Plaintiffs have alleged that the Deer Defendants told them the $260,000 was for the loan and did not tell them anything about a "fee." The Deer Defendants' motion to dismiss Count V is denied.

---

[3] Defendants' argument regarding standing also is misguided. Plaintiffs have alleged, at least in the alternative, that Deer was not actually authorized to borrow the $260,000. If he was not, then he did not convert $60,000 from Wimbledon, he converted it from Plaintiffs. If he was authorized to collect $260,000, the issue is whether the law views the $60,000, which is alleged never to have been transferred to Wimbledon, as belonging to Plaintiffs or to the borrowers when it was transferred to the "middle man." This question is not answerable on the pleadings, but Plaintiffs' claim plainly satisfies the plausibility standard and thus may proceed. Defendants have not provided the Court with any authority addressing this point—beyond citation to a case addressing basic Article III standing requirements which does not address the present situation—and thus dismissal is not appropriate.

### C. Fraud (Count VI)

The Deer Defendants argue that they cannot be sued for fraud because the letter did not specify what would happen to the $260,000 once it was wired to DS&M's client funds account. This argument was already made, and rejected, in addressing the conversion claim. Simply put, Plaintiffs are entitled to pursue Deer for his allegedly fraudulent representation that he was borrowing $260,000 for his clients (as opposed to only borrowing $200,000 for them and keeping $60,000 for himself) and that the money would be placed into escrow. The letter is not inconsistent with Plaintiffs' allegations.

The Deer Defendants further argue that even if they lied to Plaintiffs, they cannot be sued for fraud because their lie involved future conduct. Under Illinois law, "statements regarding future events or circumstances are not a basis for fraud. Such statements are regarded as mere expressions of opinion or mere promises or conjectures upon which the other party has no right to rely." *Madison Assocs. v. Bass,* 511 N.E.2d 690, 699 (Ill. App. Ct. 1st Dist. 1987) (internal citations omitted); see also *North Am. Plywood Corp. v. Oshkosh Trunk & Luggage Co.,* 263 F.2d 543, 545 (7th Cir. 1959) (holding that, in an action in tort rather than contract, "we are not concerned with the enforcement of a promise by defendants" and that "failure to comply with a future promise does not constitute fraud" under Illinois law). However, an exception to the general rule pertains "where the false statements were part of a fraudulent scheme." *Madison,* 511 N.E.2d at 700. A plaintiff may plead fraud in such a case if he can show that the defendant in bad faith made false promises that it never intended to keep and did so for the purpose of inducing the plaintiff's reliance to his detriment. See *Lillien v. Peak6 Investments, L.P.,* 417 F.3d 667, 671 (7th Cir. 2005); see also *Hoffman v. Nationwide Mut. Ins. Co.*, 2011 WL 3158708, at *7 (N.D. Ill. July 26, 2011).

First, Defendants' argument overlooks the point that Deer's alleged lies did, in fact, involve present facts. Neither the representation that Deer was acting as the authorized agent of Wimbledon, nor the representation that he was borrowing $260,000 for Wimbledon, was a promise of future conduct. These were representations of present authority and purpose. According to Plaintiffs, but for these representations, Plaintiffs would not have wire transferred $260,000 to Deer. It is certainly plausible that, as alleged in the amended complaint, Plaintiffs would not have wired Deer $260,000 had he told them he was in reality only borrowing $200,000 for Wimbledon and pocketing $60,000 for himself. Plaintiffs' allegations that Deer lied about who he was representing and what the loan was for are actionable as fraud. Furthermore, at a minimum, Plaintiffs have alleged that the false statements were part of a fraudulent scheme and made to induce Plaintiffs' reliance to their detriment. Thus, it also appears that, at a minimum, Plaintiffs have stated a claim for fraudulent inducement. See, *e.g.*, *CPE SA v. Wilton Industries, Inc.,* 2010 WL 850179, at *2 (N.D. Ill. March 3, 2010) (to state a claim for fraudulent inducement under Illinois law, a plaintiff must allege that "(1) [defendant] made a false statement of material fact; (2) [defendant] knew that the statement was false; (3) the statement was intended to induce [plaintiff's] reliance; (4) the statement induced [plaintiff's] reasonable reliance; and (5) the statement caused damage to [plaintiff]."); see also *Baxi v. Ennis Knupp & Associates, Inc.*, 2011 WL 3898034, at *11 N.D. Ill. Sept. 2, 2011) (same).

### D.     Civil Conspiracy (Count IX)

Plaintiffs also assert a state law civil conspiracy claim against Deer and Defendant Robinson, alleging that they engaged in a civil conspiracy to defraud Plaintiffs by proposing false investments. Under Illinois law, in order to allege a claim for civil conspiracy, a plaintiff must allege (1) an agreement; (2) by two or more persons; (3) to perform an overt act or acts; (4)

in furtherance of the agreement/conspiracy; (5) to accomplish an unlawful purpose or a lawful purpose by unlawful means; (6) that causes injury to another. *Bressner v. Ambroziak,* 379 F.3d 478, 483 (7th Cir. 2004) (citations omitted); see also *Fritz v. Johnston,* 807 N.E.2d 461, 470 (Ill. 2004) ("The elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act."). The overt act or acts must be tortious or unlawful acts. See *Adcock v. Brakegate, Ltd.,* 645 N.E.2d 888, 894 (Ill. 1994).

"Mere allegations of a conspiracy" generally are insufficient to withstand a motion to dismiss. *Moore,* 754 F.2d at 1352; see also *Loubser v. Thacker,* 440 F.3d 439, 442–43 (7th Cir. 2006) (although a conspiracy need not be pled with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, "it differs from other claims in having a degree of vagueness that makes a bare claim of 'conspiracy' wholly uninformative to the defendant"). The allegations must demonstrate that the parties "somehow reached an understanding" to engage in unlawful conduct. *Id.* However, conspiracies, "by their very nature, do not permit the plaintiff to allege, with complete particularity, all of the details of the conspiracy or the exact role of the defendants in the conspiracy." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1995). This is because "a conspiracy is rarely susceptible of direct proof; instead it is established from circumstantial evidence and inferences drawn from evidence, coupled with common sense knowledge * * *." Accordingly, "[a] plaintiff cannot be required to plead with specificity the very facts that can only be proven by circumstantial evidence." This is particularly true "where the necessary information * * * is within the knowledge and control of the defendant and unknown to the plaintiff." *Id*.

Plaintiffs have alleged that Robinson persuaded them to "invest" $341,500 with him by wiring it to Deer's law firm (although a small portion was wired directly to Robinson) and that Deer told them to contact him if they had any questions, which they regularly did. The amended complaint references several e-mails from Deer, which attempt to explain the delays in the trading. The Deer Defendants maintain that Plaintiffs have alleged only that Deer "relayed information" from Robinson, but in fact, Plaintiffs allege that Deer told them he had a "good comfort level" with the "investment." More importantly, they allege that Deer told them that he was preparing trading contracts for the investments. Given the general description of the "investment" scheme set forth in the amended complaint—significant rates of return with little risk, several of the individuals involved had been prohibited by Illinois and Alabama from offering investment advice, and repeated excuses as to why trading never was able to start—it can be reasonably inferred from the allegations that the "investment" was a hoax and that Deer's involvement went beyond mere representation of Robinson. Moreover, the conduct involving the Lake Bluff loan also supports Plaintiffs' position (and Count IX alleges that the conspiracy involved both transactions). Plaintiffs allege that both Deer and Robinson telephoned Plaintiffs to ask them to make the loan. After Plaintiffs wired $260,000, only $200,000 was sent to Wimbledon, and Deer admitted that he kept $60,000, claiming that it was (undisclosed) "costs associated with the loan placement." Plaintiffs have alleged that Deer took steps to assist Robinson in the scheme, and these allegations are sufficient to withstand Deer's motion to dismiss.

Deer also contends that it legally was impossible for him and Robinson, as attorney and client, to conspire together, the rationale being that he and Robinson are a single unit with unity of interests and purpose. See, *e.g.*, *Edelman, Combs & Latturner v. Hinshaw & Culberton*, 788

N.E.2d 740, 752 (Ill. App. Ct. 1st Dist. 2003) ("Because the acts of an agent are considered in law the acts of the principal, there can be no conspiracy between a principal and an agent). However, it seems unlikely that the law intends for a lawyer to use his law license as a shield to protect himself from the consequences of participating in an unlawful or illegal conspiracy. Furthermore, the Illinois ethical rules forbid a lawyer from assisting a client in committing fraud. See, *e.g.*, *Mueller Industries, Inc. v. Berkman*, 927 N.E.2d 794, 807-08 (Ill. App. Ct. 2d Dist. 2010) ("Where the crime-fraud exception applies, no attorney-client privilege exists whatsoever, and the communications at issue are not privileged."). As described in *Mueller Industries*, if Deer helped Robinson commit a fraud, it would "amount to participation in a conspiracy." *Id.* at 807. At this stage, Plaintiffs have alleged fraud with particularity and also have sufficiently alleged that Deer, by his conduct and in particularly in his assurances regarding the "investments," assisted Robinson in committing fraud. Thus, Plaintiffs have stated a claim for civil conspiracy.

### E. Professional Negligence (Counts VII and VIII)

In Counts VII and VIII, Plaintiffs allege that Defendants had an attorney-client relationship with them and therefore owed Plaintiffs a duty. To state a claim for legal malpractice under Illinois law, a plaintiff must allege the following elements: (1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney, (2) a negligent act or omission constituting a breach of that duty, (3) proximate cause of injury, and (4) actual damages. See *Snyder v. Heidelberger*, 953 N.E.2d 415, 424 (Ill. 2011).

Plaintiffs allege that Deer told them that he was their "escrow attorney" with respect to the Lake Bluff transaction.[4] Plaintiffs also allege that the Deer Defendants breached that duty by

---

[4] Defendants contend that Deer never had an attorney-client relationship with Plaintiffs. However, Plaintiffs allege that Deer told them that he was their "escrow attorney." Given that the Court assumes all

14

failing to disclose that the Deer Defendants (i) "were not looking out for Craftwork's interests with respect to the loan"; (ii) "were negotiating against the interests of Craftwork"; and (iii) "were negotiating on behalf of an attorney associated with his firm (i.e., Eisenberg) against Craftwork." Plaintiffs further contend that the Deer Defendants should have told Craftwork to hire another attorney with respect to the loan rather than tell them that Deer was their "escrow attorney." Plaintiffs contend that but for Deer's breach of duty, they would have hired their own independent legal counsel to negotiate and review the loan agreement. Finally, Plaintiffs have alleged that they were damaged. These allegations are sufficient to state a claim for professional negligence. See also *Wendt v. Handler, Thayer & Duggan, LLC*, 613 F. Supp. 2d 1021, 1034-35 (N.D. Ill. 2009).

### F. Punitive Damages

Plaintiffs seek punitive damages for Counts V (conversion), VI (fraud), and IX (conspiracy). The Deer Defendants maintain that Plaintiffs may not seek punitive damages in connection with legal services they performed. However, the Deer Defendants also maintain throughout their briefs that Deer never represented Plaintiffs. At this stage of the case, it simply is too early to tell whether Plaintiffs' may pursue punitive damages on the basis of the conduct of the Deer Defendants. See also *Weidner v. Karlin*, 932 N.E.2d 602, 606 (Ill. App. Ct. 3d Dist. 2010) (noting that "where a plaintiff's complaint for common law fraud against a defendant-attorney states a cause of action, the plaintiff's request for punitive damages is not precluded by section 2-1115 of the Code (735 ILCS 5/2-1115)").

---

well-pleaded allegations set forth in the amended complaint, Plaintiffs' allegation suffices at this stage of the case.

## IV. Conclusion

For these reasons, the Court denies the Deer Defendants' motion to dismiss [DE 49] in its entirety.

Dated: December 6, 2011

_____
Robert M. Dow, Jr.
United States District Judge